**SPENCER LIVESTOCK COMMISSION COMPANY; Mike Donaldson, Petitioners,**

v.

**DEPARTMENT OF AGRICULTURE, Respondent.**

No. 87-7189.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1988.

Decided March 8, 1988.

Dean J. Miller, Gigray, Miller, Downen, Weston & Pasley, Caldwell, Idaho, for petitioners.

* Honorable Earl H. Carroll, United States District Judge, District of Arizona, sitting by designa-

Harry S. Gold, Office of the Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., for respondent.

Before ANDERSON and FLETCHER, Circuit Judges, and CARROLL,* District Judge.

FLETCHER, Circuit Judge:

Petitioners Spencer Livestock and Michael Donaldson appeal a decision of the administrative law judge, upheld by the Judicial Officer of the Department of Agriculture, assessing $30,000 in civil penalties against them and suspending them as registrants under the Packers and Stockyards Act for 10 years. We affirm.

## FACTS

Petitioner Michael Donaldson is the president, manager and controlling shareholder of Spencer Livestock Commission Company. He was registered as both a dealer and a market agent under the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181 *et seq.* ("the Act").

This case concerns 17 transactions for livestock in March and April of 1982 involving sales by petitioners to three livestock feeders. Following complaints from feeders with whom Donaldson had done business, the Packers and Stockyards Administration, an agency of the U.S. Department of Agriculture ("USDA" or "Department"), began to investigate Donaldson's operations in May, 1982. The agency wanted to determine whether Donaldson was in compliance with the Act and with consent orders to which Donaldson had previously agreed. Investigators were especially concerned with complaints about Donaldson's failure to provide documentation for livestock purchases in Canada.

tion.

In August, an investigator requested from Donaldson all records and invoices for the previous eight months. Although Donaldson provided some materials, documents were missing that would have enabled the agency to trace the Canadian transactions. The investigator next went to the Alberta Department of Agriculture to obtain the missing documents. When he visited one of petitioners' primary Canadian livestock suppliers, however, the supplier refused on Donaldson's instructions to allow the investigator to review any documents. It was not until the next June that Canadian officials were able to forward copies of the relevant material to the agency.

On February 10, 1984, the Administrator of the agency filed a complaint against petitioners. The complaint alleged that Donaldson had committed unfair and deceptive acts in violation of 7 U.S.C. § 213(a).[1] Specifically, it charged Donaldson with buying livestock on a commission basis and then fraudulently billing his principals at weights and prices above, and shrinkages below, the actual figures at which he had purchased the livestock. It also alleged that Donaldson had failed to provide, upon the principals' request, scale tickets, purchase invoices and other documents, all in an attempt to conceal the actual prices, weights and shrinkage allowances of the livestock. Finally, the complaint charged Donaldson with failing to maintain accounts, records and memoranda that fully and accurately disclosed the true nature of his operations, in violation of 7 U.S.C. § 221.[2]

After a hearing on July 23–26, 1985, an administrative law judge (ALJ) found that, because Donaldson knew that his principals believed he was operating as a market agency, his submission of false accountings constituted fraud under section 213(a). The ALJ also found Donaldson's destruction of invoices and other documents to be independent violations of section 213(a). In addition, Donaldson's failure to keep full and correct accounts and records was in contravention of section 221, the ALJ concluded. In all, the ALJ found that Donaldson had fraudulently overcharged the feeders by more than $34,000 and had intentionally overweighed livestock by 8,000 pounds.

Noting that previous administrative and criminal sanctions had failed to deter Donaldson from committing the offenses, the ALJ decided that only severe sanctions would suffice. Accordingly, he issued a cease and desist order, imposed a civil penalty of $30,000 against Donaldson, and suspended him as a registrant under the Act for ten years. Donaldson petitioned the USDA Judicial Officer ("JO") for review. On March 19, 1987, the JO adopted the ALJ's findings as his final decision and added additional supporting conclusions. Donaldson timely petitioned this court for review.

## DISCUSSION

This court has jurisdiction over decisions of the USDA pursuant to 28 U.S.C. § 2342(2).

### A. Unfair and Deceptive Acts Under 7 U.S.C. § 213

Petitioners concede that substantial evidence supports the JO's finding that they

1. "It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with determining whether persons should be authorized to operate at the stockyards, or with the receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling of livestock." 7 U.S.C. § 213(a).

2. "Every packer or any live poultry dealer or handler, stockyard owner, market agency, and dealer shall keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business, including the true ownership of such business by stockholding or otherwise. Whenever the Secretary finds that the accounts, records, and memoranda of any such person do not fully and correctly disclose all transactions involved in his business, the Secretary may prescribe the manner and form in which such accounts, records, and memoranda shall be kept, and thereafter any such person who fails to keep such accounts, records, and memoranda in the manner and form prescribed or approved by the Secretary shall upon conviction be fined not more than $5,000, or imprisoned not more than three years, or both." 7 U.S.C. § 221.

acted in the capacity of a market agency, rather than as a dealer, and were therefore under a fiduciary duty. They contest the imposition of penalties, however, on the ground that the Department failed to demonstrate that their conduct was unfair or deceptive within the meaning of 7 U.S.C. § 213. We must uphold the JO's finding as to deception if it is supported by substantial evidence. *Bosma v. U.S. Dept. of Agric.*, 754 F.2d 804, 807 (9th Cir.1984); *Corona Livestock Auction, Inc. v. U.S. Dept. of Agric.*, 607 F.2d 811, 814 & n. 8 (9th Cir.1979).

Section 213 prohibits a market agency from engaging in "any unfair, unjustly discriminatory, or deceptive practice" in connection with the buying or selling of livestock. 7 U.S.C. § 213(a). It permits the Secretary of Agriculture to assess a civil penalty of up to $10,000 for each violation. 7 U.S.C. § 213(b). The statute does not define what is meant by the terms unfair and deceptive; it has been held that "their meaning must be determined by the facts of each case within the purposes" of the Act. *Capitol Packing Co. v. United States*, 350 F.2d 67, 76 (10th Cir.1965).

In *Central Coast Meats v. U.S. Dept. of Agric.*, 541 F.2d 1325 (9th Cir.1976), we rejected the government's argument that it was unfair under section 213 for one concern to own both a cattle-buying and a meat-packing business. *Central Coast*, 541 F.2d at 1327. Since Congress had not specifically proscribed joint ownership, we ruled that to prove a violation of section 213, the Department would have to "show that the conduct in question is likely to produce the sort of injury the Act is designed to prevent." *Id. See also Corona Livestock*, 607 F.2d at 814 n. 6.

In *Bosma*, the JO found that appellant had failed to maintain accurate records pursuant to 7 U.S.C. § 221, and that the incorrect records were deceptive under § 213. *Bosma*, 754 F.2d at 807. We distinguished *Central Coast* as "quite a different case" on the grounds that in *Bosma*, unlike *Central Coast*, Congress had specifically prohibited appellant's actions. *Id.* at 808. We concluded that where the conduct in ques-

tion is per se proscribed, we need only determine whether it may be considered "unfair" or "deceptive" absent a more specific showing of actual harm. *Id.* at 808–09.

In this case, the ALJ found three separate violations of § 213. First, petitioners' billing and collecting on falsely increased weights and prices and decreased shrinkage allowances were found to violate 9 C.F.R. §§ 201.44 and 201.55. The Department has consistently ruled false inflations of purchase weight deceptive under § 213. *See In re Collier*, 38 A.D. 957 (1979); *In re Boone Livestock Co.*, 27 A.D. 475 (1968); *In re Fairbank*, 27 A.D. 1371 (1968).

In affirming the JO's decision in *Fairbank*, this circuit implicitly accepted the characterization of false weights as deception. *Fairbank v. Hardin*, 429 F.2d 264 (9th Cir.1970). In *Fairbank*, the JO had found that appellant intentionally sold livestock, issued invoices and collected payments all at false weights, failed to keep buyer's invoices regarding his purchases, and failed to maintain accurate records. *Id.* at 266. Although we did not specifically review the Department's equation of document falsification with deception, we found the JO's conclusions within the law and supported by substantial evidence. *Id.* at 267.

The second ground on which the ALJ relied was petitioners' failure under 9 C.F.R. §§ 201.44 and 201.45 to submit complete and accurate accountings of their purchases and to make available to their principals copies of bills in payment for expense items. Since it was by these false accountings that petitioners accomplished the fraud, the ALJ found these violations also to constitute deception.

Third, the ALJ concluded that by destroying invoices and other documents showing petitioners' actual expenses, petitioners hoped to conceal their fraud—yet another violation of section 213.

Petitioners maintain that the ALJ erred in finding their conduct illegal under § 213 because their conduct did not threaten any of the interests the Act seeks to protect. They identify these interests as safeguard-

ing sellers, protecting consumers, and protecting the industry from unfair practices of competitors. Petitioners stress "of competitors" as though the Act were nothing more than a mirror of the antitrust laws. They argue that since in none of the 17 transactions did the sales price exceed the prevailing market price, there was neither harm nor threat of harm to consumers.

■ The JO rejected this line of argument by finding that "[e]ven if true, that fact would be irrelevant. An agent who secretly increases the weights and prices of livestock purchased on a commission basis for principals commits very serious violations of the Act even if the invoice prices to the principals are at or below the market." We rejected a similar argument in *Bosma*, where we found an average profit of $100 per head "sufficient evidence to support the J.O.'s conclusion that Bosma did not pay his consignors a fair price, regardless of whether they were satisfied with what they got." *Bosma*, 754 F.2d at 809.

Petitioners further characterize the feeders' belief that they were operating on commission as a "misconception," and assert that in the absence of proof of an anti-competitive effect, the Department should leave feeders to protect themselves against such "misconceptions" by insisting on written contracts.

■ This argument relies on an incomplete understanding of the objectives of the Act. The primary purpose of the Act was "to assure fair competition and *fair trade practices* in livestock marketing...." H.R.Rep. No. 1048, 85th Cong., 2d Sess., *reprinted in* 1958 U.S. Code Cong. & Admin. News 5212, 5213 (emphasis added). It was not intended merely to prevent monopolistic practices, but also to protect the livestock market from unfair and deceptive business tactics. Thus, under the *Central Coast* rule, we uphold a finding of a § 213 violation where the evidence establishes a deceptive practice, whether or not it harmed consumers or competitors.

Petitioners plainly practiced deception. When the ALJ asked Donaldson how three experienced feeders could all have been mistaken in thinking he was selling on commission, he responded: "As a rule, when you are selling cattle, the majority of people think or tend to believe that you are only charging or only making 50 cents a hundred. If somebody had that in their mind, I would do nothing to change their mind or make it be known otherwise...."

The conduct was deceptive within the meaning of the statute. A market agent must operate his business as a fiduciary. *Bosma*, 754 F.2d at 809. In *Bosma*, petitioner, a market agent, purchased for his own account cattle consigned to him for sale, but failed to list his own name as purchaser in violation of 9 C.F.R. §§ 201.-43(a) and 201.59. We found this deceptive and "inherently unfair," since it forced Bosma simultaneously to represent both his and the consignors' interests in setting a price. *Id*. It therefore ran the risk of the consignors' receiving less than the true market value of their livestock, and accordingly violated section 213.

Petitioners' case is virtually indistinguishable from Bosma's. Acting as a market agent, they, like Bosma, had a fiduciary duty to their principals. As did Bosma, they violated a regulation intended to ensure prompt accounting to those for whom the agent was acting. 9 C.F.R. § 201.44. Indeed, section 201.44 is nearly identical to § 201.43(a). The only material difference between the regulations is that one protects sellers on consignment while the other protects buyers. Petitioners, however, argue that this difference is dispositive, since our motivating concern in *Bosma* —protecting sellers from receiving less than true value—is "one of the purposes of [the] Act." They would have us find that, under *Bosma*, only potential injury to *sellers* triggers the protection of the Act.

This argument is baseless. Petitioners' duty was as clear as that imposed on Bosma, and their transgression no less. As in *Bosma*, the harm was more than hypothetical. Donaldson and Spencer obtained more than $34,000 in illegal profits from the purchaser. The Department therefore both proved actual injury and "unfair or deceptive" practices within the meaning of the statute. The JO's finding that petitioners

violated 7 U.S.C. § 213(a) was therefore supported by substantial evidence.

### B. *Propriety of the Sanctions*

Petitioners contest the sanctions imposed on the grounds that they were disproportionate to sanctions assessed in similar cases, imposed contrary to law, and impermissibly enhanced because of the ALJ's consideration of prior agency proceedings involving petitioner. We may not overturn the Department's choice of sanction unless it is unwarranted in law or unjustified in fact. *Butz v. Glover Livestock Com'n Co.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973); *Blackfoot Livestock Com'n v. Dept. of Agric.,* 810 F.2d 916, 922 (9th Cir.1987). Our review is limited to determining whether, on the facts of the case, the Secretary made an "allowable judgment." *Glover,* 411 U.S. at 189, 93 S.Ct. at 1459; *Blackfoot,* 810 F.2d at 922.

The JO upheld the penalties imposed pursuant to its "severe sanction" policy, under which the Department imposes "severe sanctions for violations of any of the regulatory programs administered by the Department that are repeated or that are regarded by the administrative officials and the Judicial Officer as serious...." Decision and Order at 207. Such has been the policy of the Department at least since *In re Worsley,* 33 A.D. 1547 (1974), where it was set forth at length. It has been frequently invoked since.[3] The JO has explained that a stiff penalty, especially suspension, " 'is not primarily punishment for

a past offense but is a necessary power granted to the Secretary of Agriculture to assure a proper adherence to the provisions of the Act.' " *Id.* at 1557, quoting *Nichols & Co. v. Sec'y of Agric.,* 131 F.2d 651, 659 (1st Cir.1942). The purpose of the policy is to deter both those on whom sanctions are imposed and other potential violators.

#### 1. *Disproportionality*

Petitioners attack the sanctions imposed on the ground that they far exceed those imposed in other egregious cases. In particular, they direct our attention to *Blackfoot,* in which the parties sanctioned had bought livestock while insolvent, mingled trust funds with operating funds, failed to pay promptly for livestock, and engaged in an $8.6 million check kiting scheme, yet were suspended for only six months. *Blackfoot,* 810 F.2d at 920–22. Since the JO failed to distinguish this case from *Blackfoot,* they contend, his imposition of a 10–year suspension was inappropriate.

This contention is meritless. While the JO has indicated that, insofar as practicable, "the sanctions imposed under a regulatory Act against comparable violators for comparable violations should be reasonably uniform," *Worsley,* 33 A.D. at 1568, he has also made clear that a respondent "has no inherent right to a sanction no more severe than that applied to others." *Id.* at 1569. The Supreme Court agrees that "[t]he employment of a sanction within the authority of an administrative agency is ... not ren-

---

**3.** *See In re Catanzaro,* 35 A.D. 26, 31–32 (1976), *aff'd mem.,* 36 A.D. 467 (9th Cir.1977); *In re Collier,* 38 A.D. 957, 971–72 (1979), *petition for review denied,* 624 F.2d 190 (9th Cir.1980) (per curiam); *In re Blackfoot Livestock Com'n Co.,* 45 A.D. 590, 633 (1986), *aff'd,* 810 F.2d 916 (9th Cir.1987); *In re Farmers and Ranchers Livestock Auction,* 45 A.D. 234, 257 (1986).

The JO routinely makes reference to the cases cited above as a sustaining of the severe sanction policy. *See, e.g.,* Decision and Order at 207 n. 56. While it is true we have upheld the Department's choice of sanction in these cases, we have never expressly "sustained" the severe sanction policy. In *Blackfoot,* we upheld the JO's authority to increase sanctions proposed by the ALJ, and noted that Blackfoot's infractions "warrant[ed] a severe sanction." *Blackfoot,* 810 F.2d at 922. In *Catanzaro* and *Collier* we af-

firmed the JO's actions, but both were memoranda dispositions, and therefore inappropriate for citation as precedent. Nonetheless, since *Catanzaro* was published in the Agricultural Decisions reporter service, the JO has repeatedly relied on it as authority for his severe sanction policy. So have two practice manuals in the field. *See* 10 N. Harl, Agricultural Law § 71.19[2] at 71–246 & nn. 171–72 (1987); 1 Agricultural Law § 3.30 at 218 n. 80 (1981) (J. Davidson, ed.).

We will continue to review decisions of the JO case by case. Where a severe sanction is warranted, it will be upheld, but where it is excessive we will reverse. That we may affirm severe sanctions in a given case reflects our judgment solely as to the facts of that case, and ought not to be construed as a blanket approval of severe sanctions in general.

dered invalid in a particular case because it is more severe than sanctions imposed in other cases.... Therefore, mere unevenness in the application of the sanction does not render its application in a particular case 'unwarranted in law.'" *Glover*, 411 U.S. at 187–88, 93 S.Ct. at 1458–59.

■ Even though we may consider disproportionality as a factor in our determination as to whether an allowable judgment as to sanctions has been made, we do not find it here. While *Blackfoot* involved a far less severe sanction, numerous other cases make clear that stiff penalties are now commonplace. In *Farmers and Ranchers*, the ALJ imposed, and the JO upheld, a five-year suspension. 45 A.D. at 235. In upholding the sanction imposed on petitioners here, the JO cited more than a dozen recent cases in which, either by order or by consent decree, sanctions of one to ten years have been assessed. In this context, the 10–year suspension, while severe, was neither disproportionate nor unforeseeable. Furthermore, the JO explained the factors that mandated a more extreme penalty in this case than in a similar recent case. These included petitioners' violation of a fiduciary duty, prior record, and violations while on probation.

### 2. Factors Considered Under § 213(b)

Petitioners contend that factors the statute mandates the ALJ and JO to consider preclude the imposition of a 10–year suspension. Section 213(b) requires the Secretary, before assessing *monetary* penalties, to consider "the gravity of the offense, the size of the business involved, and the effect of the penalty on the person's ability to continue in business." 7 U.S.C. § 213(b). Section 204, which permits the Secretary to *suspend* a registrant "for a reasonable specified period," contains no parallel provision. 7 U.S.C. § 204.

Nonetheless, petitioners argue that it is reasonable to read the § 213(b) factors into § 204, since "it does not appear to be the congressional intent to permit a sanction

which has the effect of completely and permanently excluding a person from the livestock marketing industry." Brief of Petitioner at 29.

■ Petitioners cite no authority for this contention, nor is there any. A more reasonable reading than that advanced by petitioner is that since Congress chose to include the language in one provision and omit it from the other, it did not require the factors to be considered as to the latter.[4]

### 3. Consideration of Prior Proceedings

Petitioners' final argument is that the ALJ and JO impermissibly relied on prior consent orders imposing sanctions on petitioners to support the finding of repeated violations. In July 1976, a complaint was filed against petitioners alleging that they had bought livestock on commission and then collected from principals on falsely inflated prices and weights. Donaldson signed a consent order in which he agreed to a suspension of 21 days and to cease and desist from transmitting false accounts and increasing weights. He also agreed to keep accurate accounts in the future. *In re Spencer Livestock Comm'n Co.*, 36 A.D. 1022 (1977).

In late 1979, another complaint charged Donaldson with billing and collecting on the basis of fraudulently increased weights. In December 1980, he consented to cease and desist from such practices and to maintain accurate records. 39 A.D. 1429 (1980).

The ALJ cited these orders in his review of Donaldson's record, as did the JO. The JO stated that although Donaldson "had neither admitted nor denied the allegations of the complaint in the two prior administrative proceedings, his failure to deny the allegations gives rise to an adverse inference against the [petitioners] in those cases." Petitioners argue that this reliance on the prior proceedings was improper, because in both instances the consent orders provide that the settlement was entered

---

4. Petitioners have not contested the JO's consideration of the § 213(b) factors in imposing the *monetary* sanctions. The record demonstrates

that he took all three factors into account. Decision and Order at 251–53.

into solely to settle the claim and without any admission of liability.

■ Petitioners are correct. Since by the terms of the consent orders petitioners specifically made no admission of guilt, and were not required to do so, no inference of guilt arises against petitioners from the failure to deny the allegations of the complaint. The JO clearly erred in drawing an adverse inference as to guilt. The government concedes as much. Nor could the allegations of wrongdoing that underlay the orders constitute the basis for enhanced sanctions.

■ The consent orders were not, however, the only basis for concluding that petitioners had previously violated the Act. The evidence of the current violations was overwhelming. Any consideration of the consent orders as evidence of guilt was harmless error. Besides the two administrative proceedings, Donaldson also was charged in a criminal indictment in 1978 for making false entries on invoices and other records in violation of 7 U.S.C. § 221. The falsification was made in order to bill and collect for livestock on the basis of fraudulently increased weights. Donaldson was convicted on June 4, 1979 of the offenses charged, fined $5000 and put on three years' probation.

■ The fact that the consent orders were *violated* could be used to determine what kind of sanction is needed to *deter* these petitioners from conduct prohibited by the statute. In each of the prior administrative proceedings, petitioners agreed to cease and desist from precisely the sort of behavior at issue in this case. Use of this information along with the fact that petitioners violated their criminal probation was appropriate to evaluate the deterrent value of various sanctions. The record demonstrates that the ALJ and JO used the information exactly that way. The JO stated:

> [E]ven if we were to assume that the [petitioners] in the two prior administrative cases had not committed the violations alleged in the complaints, ... nonetheless, the fact that they suffered the administrative sanctions imposed in those cases, and were ordered in both cases to cease and desist from engaging in such practices in the future, should have been enough to deter the present violations....
>
> Moreover, one would normally expect that a $5,000 criminal fine and a 3–year probationary sentence would have deterred Mike Donaldson from committing similar violations *at least during the probationary period.*

Decision and Order at 191 (emphasis in original). The ALJ likewise emphasized that "[a]dministrative and criminal sanctions previously imposed were apparently insufficient to deter respondents from committing these violations." *Id.* at 35. This, he concluded, evidenced a "demonstrated indifference" to the Act and a "blatant disdain for lawful requirements," warranting a substantial sanction. *Id.*

The JO also stressed the seriousness of petitioners' violations. "Any commission buyer who defrauds principals in fiduciary transactions has committed one of the most serious violations that can be committed under the Act." *Id.* at 200. As discussed above, the Department holds fiduciaries to a high standard and we have affirmed that stand.

Despite the JO's inappropriate use of the consent orders, it is obvious that the findings of statutory violations would have been made and the sanctions would have been imposed without the improper use. The JO appropriately justified the suspension order as the only effective deterrent in light of the respondent's disregard of previous warnings. *See Glover,* 411 U.S. at 188.

Since the JO made clear he sanctioned petitioners for a permissible purpose, and since the facts support the need for a severe penalty, the fine and suspension were warranted in law and justified in fact.

## CONCLUSION

Petitioners violated the Act, Department regulations and their fiduciary duty in 17 separate transactions. They purposely avoided correcting their principals' "misconception" as to their role, destroyed

records concerning their purchases, and tried to block the Department's investigation into the Canadian side of the transactions. They engaged in these acts while still on probation for similar offenses, and having agreed to two cease and desist orders to refrain from the fraudulent inflation of weights. This record supports the ALJ and JO's finding of deception within the meaning of 7 U.S.C. § 213, and justifies the imposition of severe sanctions.

AFFIRMED.